IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


MOHAMMED V. AKBAR


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


DLER R. MOHAMMED, APPELLANT,

V.

BARI S. AKBAR, APPELLEE.


Filed January 25, 2022.    No. A-21-081.


Appeal from the District Court for Lancaster County: PAUL W. KORSLUND, Judge, Retired. Affirmed.

Darik J. Von Loh, of Hernandez Frantz, Von Loh, for appellant.

Hoken James Aldrich, of Nebraska Coalition to End Sexual and Domestic Violence, for appellee.

Linsey A. Camplin, guardian ad litem.


PIRTLE, Chief Judge, and RIEDMANN and WELCH, Judges.

PIRTLE, Chief Judge.

## INTRODUCTION

Dler R. Mohammed appeals from an order of the district court for Lancaster County dissolving his marriage to Bari S. Akbar. Dler challenges the court's physical and legal custody determination for the parties' three minor children, certain costs he was ordered to pay, and the division of the marital estate. Based on the reasons that follow, we affirm.

## BACKGROUND

The parties were married in December 1998 in Iraq. At the time of trial, they had three minor children affected by the dissolution proceedings: Rawez, born 2005; Bayar, born 2014; and

Yar, born 2016. The parties have a fourth child, Mohammed, who had reached the age of majority and was not subject to the court's custody determination.

Dler filed a complaint for dissolution of marriage in August 2019. Bari subsequently filed an answer and counterclaim. The trial court entered a temporary order in December, awarding Dler custody of Rawez, and Bari custody of Bayar and Yar; granting Bari parenting time with Rawez in a therapeutic setting; granting Dler parenting time with Bayar and Yar on alternating weekends; and appointing a guardian ad litem (GAL) to investigate and report to the court concerning the best interests of the children. The court also ordered a reciprocal restraining order between the parties.

Trial was held on Dler's complaint and Bari's counterclaim in November 2020. Bari testified that she was primarily responsible for the care of the children during the marriage. Dler testified that both parties took care of the children but more of the responsibility fell on Bari because she did not work outside the home.

Dler testified that he wants custody of the children because he wants them to be well taken care of and safe. He testified that Yar has been diagnosed with brain cancer and that Bari does not always give him his medicine at the right time. Dler also testified that Bari hits the children when they make a mess or break something. He testified that she will not change Yar's diaper when it needs to be changed, even when he asks her to change it.

Dler testified about various injuries Bayar and Yar sustained while in Bari's care between May 2019 and July 2020. He also presented exhibits showing pictures of the children with the various injuries. Dler also testified there was at least one occasion where Bari did not have car seats for transporting Bayar and Yar.

Dler further testified that there is a lack of communication from Bari at visitation exchanges. For example, on one occasion during Dler's parenting time Yar complained of pain and started running a fever. Bari had not told Dler that Bayar and Yar had received vaccinations that day so Dler had no way of knowing that the symptoms were likely a result of the vaccinations.

Dler also testified that there was an occasion when Bari dropped off the children at daycare even though Yar was sick. Dler received a call from the daycare telling him that Yar was having a hard time breathing. Dler picked him up from daycare and took him to the doctor. Dler also testified that Bari sometimes is late picking up the children from daycare. The daycare will either call him if Bari is late or he later gets a bill from the daycare for the overtime charges.

Dler also claimed that Bari admitted to him that she was having an affair. He stated that based on their culture and tradition, once a wife cheats on her husband, the marriage is over. He stated that she "destroyed our life." He also testified that Mohammed and Rawez know about the affair.

Bari testified that there were incidents of domestic abuse during the marriage. Specifically, she testified about an assault that occurred in September 2017. She testified that Dler punched her in the face causing her to lose consciousness. Dler took her to the hospital where she was treated for her injuries and released. Before going to the hospital Dler threatened her and told her that if she told the truth about what happened "[her] life is not going to go as smoothly anymore." He told her to tell hospital staff that she tripped and fell, causing the injuries to her face.

When Bari and Dler came home from the hospital, Rawez called the police and Dler was arrested. A juvenile petition to adjudicate the children was also filed by the State as a result of the

September 2017 incident alleging that Dler had engaged in assaultive behavior toward Bari and caused bodily injury to her when one or more of the juveniles was present or nearby. Bari testified that ultimately, the criminal charges against Dler and the juvenile case were dropped because Dler forced her to recant her statements and tell the authorities that he was a good husband and he did not hit her.

Bari also testified about another assault that occurred in February 2018. She testified that Dler came into her bedroom at 3 a.m., woke her up, told her she was supposed to wait for him to come to bed, and while she was lying down he punched her in the chest. After the assault she had pain in her chest and had trouble breathing. Bari testified that she begged Dler to take her to the hospital, but he refused. He told her "you're not going to the emergency room until the morning, even if you would -- if you die right now." Mohammed took Bari to the hospital in the morning where, at the direction of Dler, he told hospital staff that Bari had fallen in the bathroom and hit her chest on the bathtub. Bari testified that she did not report the assault to law enforcement because Dler was controlling her and she was afraid of him.

Dler denied hitting Bari in September 2017 and when asked about hitting her in February 2018 he responded that he "never hit or assaulted that woman here in America, never."

In November 2018, the parties traveled to Iraq with all four of their children. Bari testified that she believed the trip was to visit family for a month and then they would return to the United States. She testified that while they were in Iraq, Dler told her he had burned her green card and passport and said to her,

> you have become a man in the U.S., in our life and yours, you have become the man and I -- I became the woman, and you have changed the dynamic of my family, and now you don't deserve to be back to the U.S. and you have to remain in Iraq.

She further testified that Dler took Mohammed and Rawez to stay with his family and left her at her family's home with Bayar and Yar and told her, "you take care of these two."

Bari testified that after a month in Iraq, she ran out of medicine for Yar and was unable to get it in Iraq. She contacted the U.S. Consulate to get an expedited Visa and returned to the United States to get Yar the medicine he needed. When describing Bari's return to the United States, Dler stated that he had taken her to Iraq for a family reunion but that she "escaped" and went back to the United States with the two youngest children. Dler returned to Nebraska with the two oldest children a short time later.

There was evidence of a third domestic altercation that occurred in May 2019 in which Dler claimed Bari stabbed him four times with a kitchen knife. Dler testified that Bari told him she was moving out and she was taking the children with her. Dler refused to let her take the children, an argument ensued, and Bari attacked him with a knife. He stated that Rawez called the police.

Rawez testified that on the day of the incident, he heard his father scream and he ran outside, where he observed his parents struggling in the grass outside of their apartment. He testified that he saw his mother with a knife in her hand and his father was holding onto his mother's hand, trying to get the knife out of her hand. He did not see his father actually get stabbed. Rawez called 911 and Bari was arrested and Dler was taken to the hospital.

Bari's account of the stabbing was much different that Dler's or Rawez' account. Bari testified that the parties were living separately at the time and she had taken Bayar and Yar to

Dler's home while she was working. When she got off work she went to Dler's home and as she was parking, Rawez started running toward her screaming that Dler had stabbed himself. She entered the house and upon seeing Dler, she asked him why he "hit" himself to which he responded, "No, you're the one who stabbed me, and today you need to go to jail." Bari testified at that point, Dler told Rawez to start recording and to say in the recording that "Mom hit my dad and she's trying to run away now." When Bari tried to leave, Dler ran after her, grabbed ahold of her and said, "You're not going anywhere, today you're gonna [sic] go to jail." Bari testified that Dler also instructed Rawez to call the police and tell them that Bari had stabbed him. Bari was arrested that day, but the charges against her were later dismissed.

Mohammed and Rawez both testified that they do not have a relationship with their mother. Both have a good relationship with their father. Rawez testified that he prefers not to speak with Bari and to keep away from her because she had dishonored the family and is disrespectful to Dler. He described her parenting of Bayar and Yar as irresponsible. He claimed that she does not watch over them or pay attention to them, they often have injuries, she is aggressive with them, and she fails to communicate important information to Dler about the children.

Mohammed was in jail at the time of trial and had been incarcerated since the beginning of 2018. He basically blamed Bari for his incarceration. Mohammed testified that his father started driving a truck in 2016 and was not home for days at a time so his mother was in charge of the house and children. He testified that during this time she provided no discipline and as a result, he made bad decisions which eventually landed him in jail. He testified that Bari often is impatient and aggressive in her parenting.

Linsey Camplin, the GAL, testified that she had observed both parties with Bayar and Yar. She testified that in regard to Dler, he was attentive to Bayar and Yar, played with them, and all their needs were met. She testified that Bayar and Yar were comfortable in Dler's home, they appeared to be enjoying their time with Dler, and it seemed like a positive relationship.

Camplin testified that in regard to Bari, Bayar and Yar had a good bond with her, they appeared safe, healthy, and happy when with her, and all their needs were met. Bayar and Yar were comfortable with Bari and have a good relationship with her.

Camplin recommended that custody of the three minor children remain the same as set forth in the temporary order, meaning Dler would have physical custody of Rawez, and Bari would have physical custody of Bayar and Yar. Camplin testified that she believed the children were all in the best place for them. She did not believe Rawez would do well if he was forced to visit or live with Bari because his relationship with his mother was strained. Camplin testified she was concerned that the same strain and difficult relationship could develop between Bari and the youngest two children if they had more time in Dler's home. She added that Bayar and Yar were doing well in Bari's home.

Camplin testified that Rawez was angry with Bari because he believed she had an affair and he saw that as betraying their family and the divorce as abandoning their family. Camplin stated that Rawez is very defensive of Dler and very accusatory of his mother. He still loves her, but is struggling with meeting Dler's expectations and the cultural norms he was raised under. In regard to cultural norms, she explained that Mohammed and Rawez grew up in Iraq and remember what life was like there before they moved to the United States about 6 years before trial. They

were raised to believe that women should be submissive to men and were to do what they were told, as opposed to what they wanted to do.

Camplin described an event which caused her concern about Dler. During an exchange of the children he began video recording Bari and involved the children in the creation of the recording. Camplin testified that "it was very clear that he was documenting it for court purposes and the children were a part of that." She stated that it can be detrimental to the children to be involved in their parents' conflict. She noted that Rawez already had a very negative impression of his mother which was "in part fueled by their father" and that she was concerned that the same influence was continuing with the two younger children and could interfere with their relationship to the same level it has with Rawez. Camplin testified that she talked to Dler about her concern with involving the children in the parents' conflict and he became defensive and did not see a problem with what he had done.

In regard to Dler's testimony and exhibits showing various injuries Bayar and Yar sustained while in Bari's care, Camplin testified that the injuries did not seem out of the ordinary for the ages of the children and the injuries that required medical treatment did not appear to be the fault of either parent.

Camplin testified that she did not talk to Rawez' counselor but Rawez seemed to like her and had no problem talking to her. Camplin suggested that the counseling continue as long as the counselor recommended it and Rawez benefitted from it.

The evidence also showed that Dler was employed throughout the marriage, including a 2-year period where he worked as a long-haul truckdriver. At the time of trial, Dler was making $11.75 per hour and working 35 to 37 hours per week. Bari did not work when the parties lived in Iraq and did not work outside the home when they moved to the United States. She started working outside the home in July 2017. She worked at a hotel from July 2017 to February 2020, where she earned $9.50 per hour. Her hours per week varied from around 25 to 40 hours.

Following trial, the court entered a decree of dissolution in January 2021. It awarded Dler primary physical custody of Rawez, and Bari primary physical custody of Bayar and Yar. The parties were awarded joint legal custody of Rawez, and Bari was awarded legal custody of Bayar and Yar. The court ordered that Rawez should continue seeing a counselor with Bari's participation to try to mend their relationship, and that Dler was responsible for the expenses associated with the counseling. It also ordered that Dler would have supervised parenting time with Bayar and Yar for up to 8 hours on the weekends and he would be responsible for all expenses associated with the supervision.

The court further ordered Dler to pay child support in the amount of $265 per month. It found that Bari had demonstrated a need for alimony and, therefore, Dler should pay a reasonable sum of alimony for a reasonable duration. However, it ordered that in place of alimony, Dler was required to pay the full costs associated with Rawez' counseling and his supervised parenting time with Bayar and Yar. The court also divided the parties' debts and assets and ordered that a judgment in the amount of $2,038.35 be entered against Dler and in favor of Bari to equalize the marital estate.

ASSIGNMENTS OF ERROR

Dler assigns that the trial court erred in (1) granting Bari legal and physical custody of Bayar and Yar, (2) granting Dler supervised parenting time, including the costs of the professional supervision, (3) ordering counseling for Rawez and the costs of the counseling to be paid by Dler, (4) granting the parties joint legal custody of Rawez, (5) ordering alimony in the form of the costs associated with Rawez' counseling and supervised parenting time with Bayar and Yar, (6) ordering Dler to assume all marital debts, and (7) ordering Dler to pay Bari $2,038.35 to equalize the division of marital estate.

STANDARD OF REVIEW

In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020).

In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

ANALYSIS

*Legal and Physical Custody of Bayar and Yar.*

Dler first assigns that the trial court erred in granting Bari legal and physical custody of Bayar and Yar. He argues that there is no evidence that this custody decision was in the best interests of the children. We disagree.

In an action for dissolution of marriage involving the custody of minor children, the court is required to make a determination of legal and physical custody based upon the children's best interests. Neb. Rev. Stat. § 42-364(1)(b) (Reissue 2016). Nebraska's Parenting Act states that it is in the best interests of the child to have a "safe, stable, and nurturing environment." Neb. Rev. Stat. § 43-2921 (Reissue 2016). To determine the best interests of a child, a court must consider, at a minimum: (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. Neb. Rev. Stat. § 43-2923(6) (Reissue 2016). Other pertinent factors a court may consider in determining the best interests of a child include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each

parent's character; and the parental capacity to provide physical care and satisfy the educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

The evidence shows that Bari was historically the primary caregiver for all of the parties' children and took care of their daily needs. Bari testified that her responsibilities as a parent were to "talk to my children, quality time, take them to their doctor appointments, take them back and forth to school, cleaning the house, cooking, inquiring from my children about their daily school routine and what has happened for them in school." She testified that Dler rarely took part in these activities and would say "I'm not a woman" and "I don't want to do these chores, as a man." Dler testified that both he and Bari took on parenting responsibilities but further stated that because Bari did not work, more of the responsibility fell on her. It was evident that Dler expected Bari to be responsible for the children.

Camplin, the GAL, testified that Bayar and Yar were doing well in Bari's care and that they were in the best place for them. She supported Bari having permanent physical custody. Camplin testified that Bayar and Yar had a good bond with their mother, and that the children were safe, healthy, happy, and all their needs were met. She further stated that they were comfortable with Bari and have a good relationship with her. Camplin testified that injuries Bayar and Yar had while in Bari's care were not out of the ordinary for children their ages and did not seem to be the fault of either parent.

Bari presented evidence of domestic abuse committed by Dler on at least two occasions in 2017 and 2018. Bari sought medical treatment on both occasions. Dler was arrested and a juvenile petition was filed following the 2017 incident. The charges and the juvenile case were dropped because Dler forced her to recant her statements. Dler denied ever hitting or assaulting "that woman here in America" but did not further testify about the specific incidents. There was also evidence of another altercation between Dler and Bari in which Dler was stabbed several times. There was conflicting evidence as to how and why this happened.

Mohammed and Rawez both testified about their mother's parenting ability and did not portray her in a positive light. However, neither Mohammed nor Rawez had a relationship with their mother at the time. Camplin believed their negative feelings about their mother were being influenced by their father. She testified that they would repeat things almost verbatim that their father had said about their mother. Camplin expressed concern that Bari's relationship with Bayar and Yar could become strained in the same way that Rawez' relationship was if they had more time in Dler's home.

Based on our de novo review of the record, we cannot say that the trial court abused its discretion in finding it was in Bayar's and Yar's best interests to award Bari legal and physical custody. This assignment of error fails.

*Dler's Supervised Parenting Time With Bayar and Yar.*

Dler assigns that the trial court erred in ordering that his parenting time with Bayar and Yar be supervised and that he pay the cost of the professional supervisor. Under this assignment of error, Dler only argues that supervised parenting time was not necessary because the GAL did not recommend it. He points out that Camplin's observations of Dler with Bayar and Yar were positive. Specifically, Camplin testified that Dler was attentive to the children, they were

comfortable in his home, all their needs were met, and they appeared to be enjoying their time with their father.

However, Camplin also testified that Rawez' negative impression of his mother and his strained relationship with her were fueled in part by Dler. She was concerned that Dler was having the same influence over Bayar and Yar which could interfere with their relationship with Bari in the same way it had with Rawez' relationship with Bari. Camplin indicated that the more time Bayar and Yar spent with Dler, the more their relationship with Bari was at risk. She also testified that she was concerned Dler was involving the children in the conflict between himself and Bari which can be detrimental to the children. When she talked to Dler about it, he did not see a problem with it.

The trial court found that Dler had "engaged in conduct with the intention to interfere with [Bari's] relationship with the minor children and that he will likely continue to do so if given unrestricted access to the two youngest minor children." We agree that it was in Bayar's and Yar's best interests that Dler's parenting time be supervised to protect the children from Dler's attempts to influence them in regard to their mother or to inappropriately involve them in matters between him and Bari. The trial court did not abuse its discretion in ordering Dler to have supervised parenting time with Bayar and Yar.

*Rawez' Counseling.*

Dler next assigns that the trial court erred in ordering counseling for Rawez with Bari's participation and ordering Dler to pay for the counseling. Dler does not argue against Rawez receiving counseling, but argues that he should not have to pay for it because it was Bari's actions, specifically her affair, that caused the breakup of the marriage and a rift in her relationship with Rawez. He contends Bari should bear the cost of the counseling to repair her relationship with Rawez.

As previously discussed, Bari's actions were not the sole cause, if any cause, of her deteriorating relationship with Rawez. Her strained relationship with Rawez was caused at least in part by Dler.

Further, the court was authorized under Neb. Rev. Stat. § 42-364.17 (Reissue 2016) to order Dler to pay the cost of counseling. The statute allows the court to order in addition to child support, the payment of "reasonable and necessary medical, dental, and eye care, medical reimbursements, day care, extracurricular activity, education and other extraordinary expenses of the child." The counseling falls under the category of a "reasonable and necessary medical expense."

There was also credible evidence that Dler was better situated than Bari to pay for the counseling. Dler had been the primary income earner during the parties' marriage and had a much longer employment history than Bari. Bari did not work for most of the marriage. She only started working in July 2017 and earned $9.50 per hour. At the time of trial, Dler was earning $11.75 per hour and was working 35 to 37 hours per week. The trial court did not abuse its discretion in ordering Dler to pay for the counseling.

*Joint Legal Custody of Rawez.*

Dler next assigns that the trial court erred in granting the parties joint legal custody of Rawez. He argues that the evidence does not support a finding that joint legal custody is in Rawez' best interests, especially considering that each party had a protection order against the other.

"Joint legal custody" is defined as "mutual authority and responsibility of the parents for making mutual fundamental decisions regarding the child's welfare, including choices regarding education and health." Neb. Rev. Stat. § 43-2922(11) (Reissue 2016). Although courts typically do not award joint legal custody when the parties are unable to communicate effectively, a trial court's decision to award joint legal or physical custody can be made without parental agreement or consent so long as it is in the child's best interests. § 42-364(3) (Cum. Supp. 2020); *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016).

As previously discussed, Camplin believed that Dler had influenced Rawez' opinion of his mother which led to their deteriorating relationship. Awarding the parties joint legal custody of Rawez ensures that Bari has some control over decisions related to the counseling she has been ordered to participate in with Rawez, as well as preserves her involvement in decisions regarding Rawez' welfare.

The court stated that it recognized the importance of both parents' participation in the children's lives, but found that Bari's limited participation in Rawez' life was in his best interests at the time. Therefore, it awarded Dler physical custody of Rawez, with Bari having therapeutic parenting time, and both parties having legal custody. Apparently, the court believed it was in Rawez' best interests to have both parents share in the decisionmaking process, despite the protection orders. We find no abuse of discretion in the trial court's decision.

*Alimony.*

Dler next assigns that the trial court erred in ordering alimony in the form of the costs associated with Rawez' counseling and Dler's supervised parenting time with Bayar and Yar. This assignment of error fails because the trial court did not order any alimony. Although the court stated that "[Bari] has demonstrated a need for alimony and therefore, [Dler] should pay [Bari] a reasonable sum in alimony for a reasonable duration," it specifically ordered that "*in place of alimony*, [Dler] shall be required to pay the full costs associated with counseling for [Rawez] and supervised visitation with [Bayar] and [Yar]." (Emphasis supplied.) Bari does not cross-appeal the court's failure to award alimony; rather, she specifically acknowledges that it did not award alimony. We therefore need not address whether it was proper for the court to substitute these payments for an award of alimony.

*Division of Marital Estate.*

Dler's last two assignments of error relate to the court's division of the marital estate. He assigns that the court erred in ordering him to assume all of the marital debts and ordering him to pay Bari $2,038.35 to equalize the division of property and debt. He argues that Bari had the financial means to pay some of the debt. He also argues that he should not have to pay an equalization payment when he was ordered to pay all of the parties' debt, child support, counseling costs, and supervised visitation costs.

In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Verzal v. Verzal*, 29 Neb. App. 904, 962 N.W.2d 563 (2021). Equitable property division is a three-step process. *Id.* The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.* The ultimate test in determining the appropriateness of a property division is fairness and reasonableness as determined by the facts of each case. *Id.*

Dler contends that he should not have been ordered to assume all of the parties' debts, but fails to mention that he was also awarded the majority of the parties' assets. The evidence showed the Dler had retained possession of most of the marital assets and the court awarded those to him. The only marital asset in the possession of Bari was a Honda Accord, which the court awarded to her along with the debt associated with the vehicle. She was also awarded the funds in two bank accounts. The other marital assets, which consisted of household furnishings, another vehicle, and "miscellaneous cash" were awarded to Dler. The court's distribution and calculation resulted in Dler receiving nearly twice the amount of the parties' net marital estate as Bari. Accordingly, the court ordered an equalization payment to provide a fair and reasonable division of the marital estate. We find no abuse of discretion in the court's division of the parties' marital estate. Dler's last two assignments of error fail.

## CONCLUSION

We conclude that the trial court did not abuse its discretion in its physical and legal custody and parenting time determination for the parties' three minor children, in ordering Dler to pay the costs associated with Rawez' counseling and his supervised visitation, and in its division of the marital estate. Accordingly, the decree of dissolution is affirmed in its entirety.

AFFIRMED.